## ARGUED AND DETERMINED

### IN THE

# SUPRENE COURT OF ARKANSAS,

### AT THE JANUARY TERM A. D. 1856.

#### CONTINUED FROM VOL. XVI.

---

## BROWN vs. WRIGHT.

Where the declaration upon a bond contains two counts, one in the usual form; the other, also, in the usual form, but setting up matter intended to meet the defence, a plea, that there was no consideration for the bond, but failing to notice the matter set up in the second count, will be intended to apply to both counts.

Where the defendant pleads, generally, that there was "no consideration for the bond sued on," the burden of the issue is upon the plaintiff; but if he pleads, specially, the matters showing a want of consideration, he thereby assumes the proof of the issue.

The burden of the issue being assumed by the defendant, by pleading specially, it is not removed from him to the plaintiff by a replication averring that there was a "valuable consideration for the bond"—such averment will be taken as a simple traverse of the plea, or treated as surplusage. *McDaniel vs. Grace et al.*, 15 *Ark. Rep.* 490.

Where the maker of a bond assures the assignee, before assignment, that the bond will be paid at maturity; and afterwards, to an action upon the bond by the assignee, pleads that there was "no consideration," he must prove that, at the time of such assurance, he was ignorant of any fraud or deception in the contract—if he was

2c

aware of any equity that would release him from the payment of the bond, and he concealed it, he is forever precluded from setting it up against the assignee.

Under a special plea of *no consideration,* it is incumbent upon the defendant to prove every material fact set out in his plea, and a failure to do so, will determine the issue against him.

A plea of *no consideration,* is sustained by proof, that the consideration of the bond sued on, was the sale of a *"patent right"* to make, use, and vend a certain medicine, represented as being patented, and that no patent had ever been issued for such medicine.

The acts, declarations, and admissions of a person, who has sold and transferred an article, or a right or privilege, made subsequent to such sale, are not admissible in evidence in a suit between others, growing out of a contract in relation to the same subject.

*Appeal from the Circuit Court of Jefferson County.*

Hon. THEODORIC F. SORRELLS, Circuit Judge.

CUMMINS, for the appellant.

YELL and S. H. HEMPSTEAD, for the appellee.

Mr. Justice HANLY delivered the opinion of the Court.

On the 14th day of August, A. D. 1852, the appellee commenced his two actions of debt against the appellant, in the Circuit Court of Jefferson county. The one was founded on a writing obligatory for the sum of $300, alleged to be made by the appellant to one Peter German, or bearer, date, 28th October, 1851, and payable 1st January next thereafter, and averring an assignment thereof by the payee to the appellee, before suit was brought, and before payment. In this declaration, there are two counts: the first being an ordinary count in debt on the writing before described, averring and stating the above facts. The second count in this declaration, is similar to the first in every particular, except that the appellee avers therein, that before he took the assignment from the payee, German, he advised the appellant that he was about to become the assignee of the writing set forth, and

desired to know if he should purchase, and was assured that all was right, and that he would pay the amount thereof at maturity; that in pursuance of this, appellee bought, and paid a valuable consideration for the said writing, &c.

The other declaration is substantially the same as the one above stated, except that the writing described therein, bears date 16th June, 1851, and is only for the sum of $150, but is described as payable as the first, and assigned to the appellee as the other.

At the return term of the summons, issued on these declarations, the appellant appeared, and on his motion the two suits were consolidated, and ordered to proceed as if but one suit had been actually brought. At the same term, and on the 4th November, the appellant filed two pleas in bar of the appellee's action—the first of which was as follows : "That heretofore, to wit: on the 16th of June, 1851, at, &c., one G. W. Cottingham, and the said Peter German, the payee in the said bond, were partners, and jointly interested in the ownership of an alleged patent-right to a certain medicine, known and commonly called "*Newsom's Vegetable Tonic;*" and said Cottingham, as such partner, then and there offered, and proposed to the said defendant, to sell and convey unto him, "the knowledge of making, vending and using, in any way, in the counties of Hot Spring, Pulaski and Saline, the said medicine, and to have all the proceeds arising from the same during the term of the patent," and then and there the said Cottingham, falsely and fraudulently represented and stated, that said medicine had been and was regularly patented under the United States laws, and the exclusive use thereof secured thereunder ; and that said parties were the sole owners of, and had the exclusive right to sell and dispose of the same, and the said defendant fully relying on the representations, so made by the said Cottingham, and having, within his reach, no other means of information in respect thereof, agreed to, and did purchase of, and from the said ———— (the name of the person is omitted ; it is presumed the pleader must have intended Cottingham,) the right of making, using and vending the said medicine in the said counties

of Hot Spring, Pulaski, and Saline, and to receive the proceeds arising therefrom during the term of the patent, for the price and sum of eight hundred dollars, and then and there, to secure part of said price and consideration, and for no other cause or consideration whatever, he executed and delivered to the said Peter German, the said bond for $150, in said declaration mentioned; and the said defendant in fact says, that in truth, and in fact, said persons, or either of them, never had any exclusive right to the said medicine, or right to sell the same, and that the same never had been patented under the United States laws, to any person or persons whatsoever, and the whole pretended right to the said medicine, and the representations in respect thereof, were, and are, a mere and sheer fabrication to defraud defendant. And so the said defendant says that the said contract was a gross and naked fraud upon, and that said bond was given without consideration by, defendant, and is void, and he ought not to be charged or made liable thereon, and this he is ready to verify, &c.

The second plea is identical with the one we have given above, except that it was intended to apply to the $300 bond, and in which the false and fraudulent representations, in respect to the medicine and the right to its exclusive use, and the fact of its being patented, are averred to be made by Peter German, the payee therein.

These were the only pleas and the only defence interposed by the appellant in the action aforesaid. After a demurrer to these pleas was overruled, the appellee filed general replications thereto, concluding to the country; and the issues being thus made up, at the November term of the Jefferson Circuit Court for 1854, the cause was submitted to a jury, on the following evidence:

On the part of the appellant, Samuel F. Sargent swore, that he was acting commissioner in the Patent Office of the United States; that on examination of the books and archives of said office, he did not find that any patent had ever been granted. to *N. Newsom;* that Nathan Newsom, of Warrenton, Alabama, on the 15th April, 1850, made application for a *Tonic Medicine,*

which application was rejected on the 2d May, 1850, and subse. quently withdrawn by the applicant.

*A. M. Barrington* testified, that G. W. Cottingham proposed to sell to him the right of making and selling a medicine called *"Newsom's Vegetable Tonic,"* and said to him, that he (Cottingham) had not seen the patent, but had no doubt but that it was patented. Cottingham further stated to the witness, that a man by the name of Roser had procured the right of making and vending said medicine in the States of Arkansas and Texas, and that he (Cottingham) had procured the right for the State of Arkansas from the said Roser; further stating, that Roser had seen the patent and promised to send him a copy; that these conversations grew out of the fact, that Cottingham had proposed to sell witness the right to make and vend said medicine in two counties in the State of Arkansas; that on observing the discrepancies in his statements, witness declined to make the purchase from him; and that the letters, hereinafter copied, purporting to have been written by the said Cottingham, together with the bill of sale purporting to have been made by him, are in his hand writing: witness being familiar with it.

*Lewis S. Marshall* testified, that he was of a committee, appointed by the Conference of the Methodist Church, to investigate charges against G. W. Cottingham, and that upon that investigation, the papers referred to by Barrington, (those hereinafter copied) were before said committee; that they came addressed to witness through the post office, and supposed they came from Cottingham, in due course of correspondence; that Cottingham voluntarily submitted to the trial before the church, and that the papers referred to, were submitted in his defence, which resulted in his suspension from further exercise of ministerial duties.

*Peter Haskew* testified to about the same fact, as stated to have been made by Marshall, as above.

Doctors *Wright, Tucker and Connel* swore, that the several ingredients specified in the document hereafter copied, marked

M, have been long known to the medical profession, and the medical properties thereof well understood; that they are of common use among physicians, and are useful in some cases, and that they are all mentioned in the United States Dispensatory, and their qualities and uses therein pointed out.

*Peter F. Morton* stated, that he has known the use of the compound, denominated "Newsom's Tonic," for several years past; thought it good in some cases of chills and fevers; has used it himself in Kentucky and this State; has known it as long ago as 1849. It was then sold through Kentucky, and was not then patented. In 1851, or about that time, in Jefferson county, Arkansas, he had a conversation with G. W. Cottingham about said medicine; witness told him he did not believe it was patented; that he knew it was not in 1849; that at the time this conversation occurred Cottingham had sold the patent-right, to a part of this State, to Barrington; who, in consequence of the discovery that no patent existed, rescinded the trade. This was before Cottingham sold to German or Brown. Cottingham remarked to witness, that he had great confidence in Roser, who claimed the right to dispose of it in Mississippi; and said from Roser's statement, he thought the medicine had been, or would be, patented. After German bought the right from Cottingham, witness knew German sold it in the vicinity of Pine Bluff, for witness had bought some of it from German. The medicine was advertised in Pine Bluff, and through the country. There were also hand bills circulated, similar to the one hereafter copied. Witness believed German was active in recommending the medicine, and giving it character.

*T. S. James* stated, that Cottingham came to him, and offered to sell Brown's note for $500, or several notes amounting to about this sum, and proposed to take $200 or $250 for them. Witness thought there must have been something wrong, from the large discount offered, and declined having anything to do with it; but told him Brown was good, and advised him that Brown would take up his own note at the proposed discount, if there was nothing wrong in the matter. Witness saw the medicine called

"Newsom's Vegetable Tonic" advertised, but did not know at whose instance.

*Peter German* deposed that the document hereafter copied, marked M, and referred to by Doctors Wright, Tucker and Connel, contains a correct statement of all the ingredients, and the mode of making and compounding the medicine known as "Newsom's Vegetable Tonic," which said exhibit so referred to, marked M, is as follows:

## A RECIPE.

5 Gallons Precipitated Bark.
4 pounds Willow inner bark, fresh.
4    "    Cherry   "    "    "
4    "    Dogwood "    "    "
4    "    Sarsaparilla in root.
4    "    Boneset—fresh—boiled in as much clear water as will cover the articles. Boil down to one gallon, then strain through a fine cloth, and add 4 gallons American Brandy; then take 6 or 8 ounces of extract of barks dissolved in the brandy, 1 ounce of the oil cinnamon, 1 pint of alcohol, make an essence, then mix all together, and it is ready for use.

Peter German further stated, that during the year 1851, he made and sold this medicine; bought the patent (supposed) right for Jefferson and Dallas counties, from Cottingham. Paid him for the right to Jefferson, $400 in cash. Witness afterwards sold the same to appellant—Jefferson for $300, and Dallas for $150. At another time, witness bought from Cottingham the right to Saline, Pulaski, Hot Spring, Drew and Bradley counties, in this State, which he also afterwards sold to appellant for $600. That the contract, or bill of sale hereafter copied, marked L was the bill of sale executed by witness to appellant, for the sale of the right to Jefferson and Dallas counties; that the note for $150, sued on in this cause, was given for the right to Dallas county, and was executed at the same time that the bill of sale above referred to was made; that the sale of the right to the other counties named, was made by the witness in person to appellant; that

witness had bought from Cottingham the absolute right to the counties he sold appellant, before the sale to him; had no recollection that Cottingham was present, or had anything to do with the sales made to appellant, but was fully confident he had not; that the $300 note sued on was given by the appellant for the sale of the right to Jefferson county alone; that appellant applied to witness to purchase this right; that witness had every confidence in Cottingham, and implicitly believed his statements as to the patent and said medicine; that appellant seemed to have the same confidence in Cottingham that the witness had; and he, witness, thought that appellant knew just as much about the matter, in every way, as witness did; that when appellant applied to buy witness out, he said he thought he could make money out of the medicine, and said *he* intended to make or break at it; that witness did not know whether the document, marked K, hereafter to be copied, was executed by Cottingham upon the sale that he, witness, made to appellant; if it was, witness had no recollection of it, and it must have been done, if at all, without his knowledge; that on each of his sales to appellant, he, witness, pursued the same form adopted to the one already referred to marked, L; that the second sale, which he made to appellant, was for several counties, and the price was $600, and the $300 note sued on in this cause, was no part of this, but for the right to Jefferson county; that the last sale made to appellant, was made prior to his, witness', removal from Pine Bluff, about 24th December, 1851; that appellant applied to him to rescind all the contracts about the medicine, stating as the ground, that it was not patented; that witness refused, and told appellant he could not, as he had assigned his notes. Appellant then knew that appellee had the notes; that in the fall of 1851, appellant was informed that appellee had the notes, and he then said he would pay them when due: that when the notes were given, appellant fixed his own time, at which he thought he could pay them, and said he would pay them out of his crop, if he could not make the money out of said medicine; that witness and appellant then fully believed

the medicine had been patented; that witness never was present at, or had any thing to do with, any transaction or trade between appellant and Cottingham; that when appellant bought of witness, he said he was going largely into the business, and when he was informed of the assignment to the appellee, of the bonds sued on, he seemed to be satisfied, and approved of it; that the medicine was a valuable one, and that witness made money out of it, and could have made a great deal more, if several members of his family had not died, which induced him to give over the business; that when witness had the medicine, he issued hand-bills, such as the one set forth below, and circulated them through the country; that he also advertised the said medicine, for the purpose of giving to it further notoriety, hoping to extend its sale thereby.

The following documents and letters were also read to the jury, as the residue of the evidence for the appellant:

TEXANA, February 9th, 1854.

BROTHER BROWN—*Dear Sir :* I am now ready to make what reparation is right. I have sold every thing for that purpose. I am willing to pay every *cent* I have ever received, and ten per cent. This will be an entire loss, as S. D. Roser has run away and gone to California. It smashes me, but this will matter nothing in the day of final account. Please write if this will satisfy you; and, if I cannot obtain a draft on some house in New Orleans, that will answer, or that I obtain a check and send it at your risk, or can you find some trusty man, coming to look at the country, by whom I may send it? Write me soon, as wish this thing immediately. Direct your letter to Texana, Jackson county, Texas.

Yours, &c.

G. W. COTTINGHAM.

HALLATSVILLE, February 22d, 1853.

BROTHER HASKEW—*Dear Brother :* In looking over my letters, which I sent to the committee, I see that I have not been as ex-

plicit on one point, I ought to have been—it is this: Bishop
Payne publicly stated to the members of the Texas Conference,
that there was nothing against my moral character, and that it
was only necessary for me to make restitutions, (explaining the
case) and then he would transfer me to this conference immedi-
ately ; and, in view of this fact, left work for me. He also stated,
in the presence of my father, that there was nothing else against
me, and so soon as I could arrange this matter to your satisfac-
tion, that you would furnish him with a statement of the facts
at Aberdeen, Mississippi, and he would transfer me immediately.
He also stated, that the secretary of your conference would furn-
ish me with all the particulars, but not one word have I received.
Now, Brother Haskew, you know all about the matter; how I
sold to German, and German to Brown, all in good faith, all be-
lieving the medicine patented. It was not ; we were all deceived,
and I am giving up all I have to cure the evil. Is this enough ?
Brothers Harris and Wood, both from Arkansas, say it is. The
situation of my family will not permit me to return, and I wish
to be free, and if there be anything else necessary, will you let me
know immediately, at Huntsville, Lavaca county, Texas ; and
will you endeavor to adjust this matter as soon as possible, if you
please ?  I want to do right, live right, and die right.

          Your afflicted friend and brother in Christ,

                          G. W. COTTINGHAM.

    The appellant then read to the jury, as evidence in his behalf,
a copy of charges preferred before the conference of the Methodist
Church, against the said Cottingham, as follows : 1st Charge—
Fraud, specification : In selling the right to Rev. Fountain
Brown and others, to make and vend a certain patent medicine,
viz : "Newsom's Vegetable Tonic," when there was no such medi-
cine patented.

    As further evidence, the appellant read to the jury the follow-
ing letters, written by the said Cottingham, to wit :

    "To the committee of investigation appointed on my case, by
the Arkansas Annual Conference—

DEAR BRETHREN: You have in the communication which I send you, a fair statement of what I am willing to do in this matter. I further state, relative to delivering up my property, that I am willing to put it into the hands of the presiding Elder of the Victoria District, Daniel Carl, Uriah Clay, or Judge Holt of Texana.

So far as the others have suffered through my misrepresentations, my property stands pledged to make them whole : but, if any acknowledgement of guilt is expected on my part, I must beg to be excused, as I have not been conscious of any intentional wrong in the matter. I have no acknowledgement to make. At any time when I shall be convinced of any intentional wrong, I am ready to make all reasonable acknowledgements that may be required. The reason of my not having made these propositions before, is, that I had not learned that the medicine was not patented until I learned it from Bishop Payne.

Now, brethren, I feel that my appropriate work is to "*preach Christ*" to the people, to offer to the starving thousands the bread of life. In this, all my interests are embarked, in this I glory; but, so long as this matter is unsettled, it, in a great measure, hedges up my way. Yet I am determined, if hungry starving souls perish through the lack of my labor, that their blood shall not be required at my hands.

But I trust the matter may be amicably arranged, and I go about my Master's work. Should it be thought necessary, in order to correct any false impression which may have been made, you are at liberty to publish any part, or all, of these communications.

Your brother in Christ,

G. W. COTTINGHAM.

HALLATSVILLE, April 19th, 1853.

DEAR BROTHER SLOAN : I received your letter yesterday, and the spirit of the letter made me feel it was from a brother and friend, and would to God, that I could comply with the request you

make, and be with you at Richland. But the condition of my family is such that no man, acquainted with all the circumstances, would advise me to such a course. Besides, my property consists in cattle and land, which I have not been able to cash, or would send what I ought to restore with this letter. I have an arrangement, which I expect to make in a few days, that will enable me to make such restoration. It will strip me of every thing, and leave me in abject poverty, and my only recourse will be Roser; and what I have recently learned, it will be a total loss. Now brother Sloan, if there is truth in me, I will do every thing in my power to liquidate all defaults where there may be a moral obligation.

Now, is not this all that is required—all that can be required of me? As to my intending wrong in this thing, I never did. I wish you to tell brother Brown that I will do right, by the grace of God; I will do right. If your committee suspend me, I am ruined; and, unless a great change in my mind, I shall give up my credentials, and I know not what I shall do; if you acquit, and transfer me, I have brought myself under obligations, as strong as words can make them. If this committee suspend me, I am ruined. If you acquit, I am saved, and shall forever feel grateful to your committee, for extending that charity and clemency that erring and unfortunate man so often needs. I am an itinerant preacher at heart, and I should never have risen in my defence, had I not felt that necessity was laid upon me. God called me to the work, and is still blessing me in it, in a signal manner, for his grace has been sufficient for me in all my difficulty, in whom I trust; may he guide you aright in your decision.

Your afflicted and fraternal brother,

G. W. COTTINGHAM.

HALLATSVILLE, April 15, 1853.

*Brothers Haskew, Martial and Sloan*—DEAR BRETHREN: Your letter has just come to hand, as also a few days since a letter from Brothers Haskew and Ratcliff, which I should have re-

ceived months before. These letters present my difficulty in a different light to that which Bishop Payne received it. What the Bishop said to me, he said publicly to the Texas Conference. It is very strange the Bishop so misunderstood this matter. I am almost ready to give it up and not make another effort, for it appears unnecessary to do or say more; for, my friends from Arkansas and Texas Conferences, to whom this matter has been submitted, say that I have offered all that is right and fair; and it would most certainly be settled at once, but your committee would require my presence. Permit me to say, this I cannot do, without neglecting my family, nor do I find any of my friends, who know my condition, who advise me to such a course. Brother Harris (well known to Brother Brown,) felt sure, if my propositions did not satisfy, that he had no thought that anything that I could say or do, in person, would satisfy: and remarked: "He wrote to your committee, in my behalf, that I denied any wrong in all this matter." But there was a wrong, but did I persist in that wrong, when convinced? No! but at once proposed to strip myself of everything, and reduce myself and family to abject poverty, in order to cure the evil. Now, if your committee can find any reasonable set of men that will require more, then, if I can, I will do more. Now, what I have written from time to time, on this subject, has been written in the fear of God, with an eye single to *his* glory, intending to dedicate to God and his church my time, talents, and my influence with others. Now, if with all this before you, you suspend me, you ruin me and my family. It would be far better for us, for you to consign us to one grave; there soon we would be forgotten. But, if you sespend me, odium and a stigma, that no body of men can wipe off, must attach itself to us. Hence, unless my mind changes, your decision, in my case, is final. As to my having made false assertions about the medicines, whatever Barrington may have understood me as saying, it is false, and *woe* to that man who would crush an innocent man, for if the withering curse of Deity does not fall on such a man, in this life, there is a com-

ing world: therein shall I see those accusors, and if they have judged without mercy and charity, then will confusion fix itself upon an immortal brow, for you will not be as men; for, thank God, I feel that I can settle the evil that has grown out of my ignorance; but without, you can make no restitution. Now, brethren, in your hands my all rests. You can save, or you can destroy me. I am willing to do whatever any disinterested man and christian will say; and if, with such propositions, you suffer me ruined, the blood of innocence be on you. May the God of Heaven bless you in your deliberations in my case.

Your afflicted brother,

G. W. COTTINGHAM.

The appellant read to the jury the following placard, or hand bill, as further evidence in his behalf:

"NEWSOM'S VEGETABLE TONIC.—A new article in medical practice—a safe, certain and *prompt* cure for *ague and fever, congestion, dysintery, cholera-morbus, female obstructions, dyspepsia, general debility,*" &c.

EXHIBIT K.—Know all men by these presents, that I, G. W. Cottingham, of the county of Jefferson, and State of Arkansas, for and in consideration of the sum of eight hundred dollars, to me in hand paid, by Fountain Brown, of the county and State aforesaid, have granted, bargained, and sold and conveyed, unto the said Fountain Brown, the knowledge of making, and the right of vending and using, in every way he may think proper, in the counties of Hot Spring, Pulaski and Saline, a new patent medicine, to wit: "Newsom's Vegetable Tonic," and to have all the proceeds arising from the same, during the term of the patent.

G. W. COTTINGHAM, <em>Agent</em>

<em>for State of Arkansas.</em>

*Pine Bluff*, June 16, 1851.

EXHIBIT L.—1851.

PINE BLUFF, October 28th.

Know all men by these presents, that I have this day sold to Fountain Brown, the patent-right to Jefferson and Dallas counties, of "Newsom's Vegetable Tonic." He is to have all the rights and benefits arising to him from the same.

PETER GERMAN.

PATENT OFFICE, February 2, 1852.

SIR: I return herewith Mr. Brown's letter; and, in reply to his inquiry, state that no patent for a "Vegetable Tonic" has been issued to Nathan Newsom.

I have the honor to be,
Very respectfully, your obt. serv't.,

THOS. EWBANK, *Com.*

To Hon. R. W. JOHNSON,
*House of Representatives.*

The evidence, as above, was introduced by the appellant, which being concluded, the appellee then read to the jury, on his part, the two bonds, *to wit:* the one for $150, and the other for $300, described in the declaration, which was all the evidence adduced in the cause.

The court, on the motion of the appellant, instructed the jury as follows:

1st. If the jury believe, from the evidence, that the medicine, for which the bonds in controversy were given, was not, in truth, patented by the Government of the United States, and the contract was for the exclusive patent-right to such medicine, then the transaction was, and is, in law, a fraud on the purchaser.

2d. That, in this case, William Wright, the assignee of the instruments sued on, stands on the same grounds, and is subject to be defeated by the same defence as if the suit were brought in the name of Peter German, the payee.

*3d.* The written contracts in evidence in the cause, are conclusive upon the parties, and no evidence can be considered by the jury to change, alter, or vary the written contract.

*4th.* Without a patent, duly granted by the United States, no one can have an exclusive right to any medicine, or other invention, and could not sell the same so as to vest an exclusive right to make or vend the same, in his vendee; any one having as much right as another to make and sell the same; but a party may sell an exclusive right to property.

*5th.* No patent can be granted for the exclusive use of a medicine, if all the ingredients and qualities thereof have been long known to the medical profession, or the public.

*6th.* All evidence in this case, which goes to show the good qualities or properties of the medicine referred to, should be disregarded by the jury.

*7th.* When a party undertakes to sell, and does sell a patent-right, he cannot recover on notes given therefor, unless he prove he had a patent from the proper authority of the United States.

It does not appear, from the bill of exceptions, that the appellee moved or asked for any instructions at all : but the court, without motion, charged the jury as follows: "That the jury should exclude from their consideration all the evidence in relation to the acts, declarations and admissions of Cottingham, with which German was not connected, and in which he did not participate; and that the notes and contracts of the parties, are conclusive on them; and all parol evidence, in regard to contracts, should be excluded from the minds of the jury: and the notes sued on, were *prima facie* evidence of debt, and it devolved on defendant to prove that they were obtained by *fraud* or *without consideration.*"

On the foregoing issues, evidence and instructions, the jury returned a verdict for the appellee, for the amount of the two notes declared on : that is to say, for the one for $300 and $150, and the accrued interest. On the return of this verdict, the appellant filed his motion in the court below for a new trial, and assigned the following causes, *to wit:*

1. Because the jury found contrary to the evidence.

2. Because the jury found contrary to the instructions of the court.

3. Because the jury were wholly misled as to the issues joined, and the law arising upon the facts, or misunderstood the charge of the court, as to what would avoid the instruments sued on.

4. Because the court erred in the general charge to the jury.

5. Because the finding was for too much, according to the proof in the case.

Which was overruled by the court; and, thereupon, the appellant excepted, setting out the evidence aforesaid, the instructions, and the said motion for a new trial, in his bill of exceptions; filed his affidavit, prayed an appeal which was granted, and entered into the recognizance required by law, to the end that his appeal might operate as a supersedeas.

On this state of facts, the appellant has filed in this court his assignment in errors, setting out the following, *to wit :*

*1st.* That the court erred in overruling the motion of said appellant for a new trial.

*2d.* The court erred in giving the instructions to the jury.

*3d.* That the court erred in refusing certain instructions moved by said appellant.

*4th.* The finding of the jury was contrary to the law and evidence.

*5th.* The finding of the jury was for too much.

*6th.* General assignment of errors.

The record brought to this court is quite a voluminous one, embodying, as it does, all the facts submitted to the jury in the form of oral testimony, depositions and documentary evidence, as well as the pleadings in the cause. We have thought proper to give a full and concise statement of the case; and have, in many instances, copied the evidence in the very language in which it appears in the transcript. This we have done to the end, and with the view that our conclusions, upon the law, may be properly understood, and their application made to the facts

3c

and particular state of the case, as it really and truly exists on the record.

Before proceeding to the determination of the several errors assigned, we desire to premise that the record, in this instance, shows a most unprecedented liberality, on the part of the counsel for the appellee in the court below, in not objecting to the *admissibility* or *competency* of much of the evidence copied in the transcript; for it does not appear that any objection was urged to the introduction of any portion of it at the trial. In noticing the fact, we do not desire to be understood as disapproving the liberality manifested by counsel in the court below. Our object in doing so, being, in part, to record our approval of the liberal spirit indicated; and, at the same time, place the court, before whom the proceedings were had, in a proper position in respect to the matter, to the end that it should not be held responsible for what otherwise might seem an improper admission of evidence.

To review the errors assigned, the judgment of this court is invoked.

Before proceeding to determine the several errors assigned, we will take up and consider several incidental and preliminary questions presented by the record, and raised by the argument of counsel in this cause.

It is insisted, upon the part of the appellee, that the judgment of the Circuit Court must be sustained and affirmed, for the reason, that the appellee inserted in his declarations on both bonds, counts averring that after said bonds were made, appellant induced appellee to buy them by assuring him that they were good and valid, and that they would be paid, and that the pleas interposed by the appellant are not responsive to those counts; and, in point of fact, that those counts remain to this time unanswered, and virtually confessed by the appellant.

On examination of the pleas, we think it very evident the pleader did design them to apply only to the usual counts on the bonds, *i. e.:* the first count in each declaration, for it will be

observed that no allusion is made in them to the averments contained in the above counts in the declaration. Conceding this point, then, for the appellee, the question results, whether the appellee should not have had judgment in the court below.

It has been the rule of practice of this court, sanctioned and authorized by legislative enactment, (*Digest*, 827, *sec.* 37,) from the period of its organization to the present, "In all cases coming before it for revision or correction, by appeal, or upon writs of error, &c., &c., &c., to open the whole record for re-examination and revision, and that the party injured shall have full benefit of all and every objection and exception, that would have availed him upon the proceedings in the court below, though not formally taken or made at the time of the trial, &c., &c., &c., if not cured by the statute of amendments and jeofails, or aided by verdict. See *Pope Gov. use of Reed vs. Latham et al.*, 1 *Ark. Rep.* 72. With this broad and liberal rule before us, let us return to the position of the appellee, stated above, and determine whether he is sustained in it. To do so, we shall have to recur necessarily to his declaration, and the appellant's two pleas. Does the appellee attempt in his declaration to count on the promise which he avers to have been made by appellant to the appellee before he bought and became the purchaser of the bonds set out in his declaration; or does he count on the bonds, and set up the matters averred as a reason why he should not be barred from having and maintaining his action thereon? If the latter, then the pleas of the appellant will be intended to apply to these counts, as to the first. In pleading, all intendments are taken most strongly against the pleader, and most favorable to his adversary; for the reason, that it is to be presumed that every person states his case most favorable to himself. 1 *Chitty's Pleadings* 237. In view of this, then, how are we to construe the latter counts in the appellee's declaration? We are constrained to hold that he declared, in these counts, on the two bonds set out, and that he intended the matter in reference to the understanding between himself and appellant, as only inducement, or that it is surplus-

age. And we conceive that we are sustained in this, from the fact, that the appellee absolutely makes profert of the bonds in these counts; which, of course, he would not have done if *they* had not been intended by him, as the causes of action declared on. Besides this, the court would be doing violence to its own feelings to suppose, for a moment, that the counsel intended, by his declaration, to anticipate from his adversary, a defence which he should have made, if at all, at law, in response to a plea denying the consideration of the bonds sued on. The bonds being regarded as the causes of action in each count; it follows, therefore, that the pleas of the appellant denying their consideration, are responsive to the whole declaration.

Having disposed of the question just considered, invited by the argument of the appellee, we will next proceed to the determination of one, to which the attention of the court has been called by the argument of the appellant, being like the first, outside, but resulting from the errors assigned. It is insisted by the appellant, that the burden of the issues presented by the record, was upon the appellee, and specious arguments are resorted to with the view of establishing this position. We shall have to resort again to the pleas and the replications thereto, to determine the question. ·

The pleas interposed are, virtually, pleas denying the consideration superinducing the execution of the instruments sued on. The gravaman of the pleas, in the one case, is that Cottingham represented that the medicine was patented, when it was not; and in the other, that German made the representation. A failure of consideration must proceed from some fact or occurrence, which intervenes between the making the contract and the time of pleading. In the case at bar, the appellant avers in his pleas that at the time the representations were made by the parties respectively, in respect to the medicine, it was not patented, nor had it been up to the time of the filing the pleas. The appellant might have plead generally, "no consideration:" (see *Dickson vs. Burke*, 1 *Eng. Rep.* 412), in which event the burden of

the issue would have been upon the appellee, but electing to plead the matter specially, as in case of *failure* of consideration, he must be held to the consequences thereof, *i. e.;* the proof of the issue assumed by himself; for by pleading specially, he pleads by way of confession and avoidance, as in case of special *non est factum*, and the issue is on him.    See *Pope Gov. use, &c. vs. Latham et al.*, before referred to, and the authorities cited.    And this we say in respect to both bonds, notwithstanding the replication of the appellee to the plea of appellant averring the want of consideration of the one for $300, replies that, as to that, there was a *"valuable consideration;"* for this averment, on his part, we can hold in no other light than as a simple traverse, though perhaps inartificial, of the appellant's plea, to which it was intended to apply.    See *McDaniel vs. Grace et al.*, 15 *Ark. Rep.* 490.

Having thus disposed of all the incidental, or preliminary questions presented by the record, and argument of counsel in this cause, we will at once proceed to the determination of those directly involved in the assignment of errors.

The appellee stands before this court as the assignee of the choses in action declared on.    The evidence, upon which the jury acted, is before us, and we are asked to set aside the verdict predicated upon those facts, and reverse the judgment of the court based thereon, for the reason, as it is asserted "that the finding of the jury was contrary to law and evidence."

In determining this question, we are irresistibly forced into the inquiry, whether the fact of appellee's relation to the original parties to the bonds sued on, taken in connection with the facts elicited at the trial, do not place him in such a position as to make it imperative on the court, to affirm the judgment of the court below ?

The 3*d section* of our *act* of *Assignments, (chap.* 15, *Dig., p.* 162,) provides that : "Nothing contained in this act shall change the nature of the defence, or prevent the allowance of discounts or off-setts, either in law or equity, that any defendant may have against the original assignor, previous to the assignment, or against the plaintiff, or assignee after the assignment."

We have holden, that though the pleas of the appellant are special pleas, and as ' a consequence thereof, that the burden of proof was on him, that nevertheless they were pleas setting up a want of consideration of the instruments sued on.   If the pleas had been *no consideration*, generally, from analogy to the rule of evidence in the case of an issue on a *general non est factum*, as well as the principles of law laid down by this court in the case of *Chancy use &c. vs. Higginbotham*, 5 *Eng. Rep.* 275, and authorities there cited, the issue would have been upon the appellee.

The *special plea of no consideration*, though it imposes burdens upon the party pleading it, does not, in the slightest degree, alter or change the rights of the adversary party, in respect to his defence thereunder.   Under an issue on a general plea of "no consideration," the appellee might well have shown, standing in the attitude of an assignee, as he does in this instance, the facts that he attempts to make available to him in his declaration, to the effect, that before he bought the bonds, he gave notice of his intention to do so, to the appellant, and that appellant assured him the said bonds were good, and would be paid at maturity ; for we hold that nothwithstanding the above recited statute, and the subsequent adjudications of this court construing it, which we fully approve and re-affirm, the appellant, if he was cognizant of the fraud alleged to have been perpetrated by Cottingham and German, or by German alone, in the sale of the patent-right to the " *Vegetable Tonic*," when he was applied to, as is alleged by the appellee declaring his purpose to purchase and become the assignee of the bonds sued on, as a consequence thereof, has forever precluded himself from all relief in consequence of a want, or because of their being no consideration moving from Cottingham and German to himself for the act; and we are sustained in this view by both principle and authority.   See *McLain & Badgett vs. Coulter*, 5 *Ark. Rep.* 16; 1 *Tucker's Com.* 335, where the author says :   "If *before* the assignee takes an assignment, he applies to the obligor, informs him of his design to buy, and requests to

be informed if he has any objection to the payment; if the obli-, gor is *aware of his equity, and conceals it*, he cannot afterwards set it up against the assignee, who has been thus induced by his representations and fraudulent conduct to pay his money for the bond." See, also, *Davis vs. Bar*, 9 *Serg. & Rawle* 141 ; *Reedy and wife vs. Warner*, 16 *Serg. & Rawle* 21 ; *Elliott use &c. vs. Callan*, 1 *Pen. Rep.* 30 ; *Decker use &c. vs. Eisenharrer & Bolander*, *ib.* 478, *et seq.; Buckner et al. vs. Smith et al.*, 1 *Wash. Va. Rep.* 381. Indeed, some of the authorities, which we have quoted, go much further than we have thought proper to go in the present case ; holding, as they do, that the above would be the effect, whether the party, the obligor, was aware of his equity, or not, at the time of the application to him by the intended assignee of the bond. Not having an opportunity of examining all the authorities on the subject, and the point not being directly involved in the cause under consideration, beyond the qualification as contained in the extract from Judge TUCKER's work, we will content ourselves, for the time being, with adopting that as the law.

It is insisted by appellee, that it is manifest, from the testimony adduced at the trial, that appellant was applied to by appellee, to know if the bonds sued on, which he also insists he represented at the time, he was about to buy and purchase, were good and valid; and that appellant assured appellee that they were, and would be paid; and it is further insisted by the appellee, that he bought and paid a valuable consideration for the bonds in question, under this assurance. If this were true in point of fact, which we cannot admit from the evidence set out in the bill of exceptions, it would undoubtedly have been incumbent upon the appellant, as a material matter of defence, on his part to prove that, at the time application was made to him, as is supposed by the appellee, saying he was about to purchase the bonds, he was ignorant of the fraud and deception said to have been practised upon him by Cottingham and German.

But, as we have before stated, the proof shows no such state of

facts. German was the only witness who made any statement in relation to the matter at all, and his statement is to this effect: "That in the fall of 1851, Brown was informed Wright had the notes, and he then said he would pay them when they fell due, but asked me not to assign the others." This was, of course, posterior to the assignment to appellee, and gives evidence, to us conclusive, that appellant had not been consulted by appellee, before he became the assignee of the bonds in question; and, consequently, under the provisions of the statute, which we have quoted above, and in conformity with the ruling of this court, in the case *Walker ad, et al. vs. Johnson et al.*, 13 *Ark Rep.* 522, his proof, as qualified by this opinion, should have been available to him before the jury.

We will, therefore refer, to the pleas of the appellant, the issues thereon, and the proof introduced in support thereof, so far as it may be necessary for our present purposes, and in conformity with our views hereinafter expressed.

Then, as to the plea of the appellant as to the $150 bond. In this, he substantially avers that Cottingham and German were partners, or were jointly interested in an alleged patent-right to a certain medicine called Newsom's Vegetable Tonic—that the former offered to sell to appellant the knowledge of making and the exclusive right of using and vending the same, in the counties of Hot Spring, Pulaski and Saline, in this State, and have the proceeds arising therefrom, during the term of the alleged patent; that Cottingham falsely and fraudulently represented said medicine to be regularly patented under the acts of Congress, traversing the issuance of the patent; and, as a consequence, a want of consideration for said bond. The proof of the issue upon this plea, as we before remarked and held, was on the appellant. Do the facts of the case prove beyond all doubt, question or cavil, every fact that was material and necessary for the appellant to have made out to support and maintain the issue which he himself invirted and tendered? An appeal to them will show that the appellant failed to prove that Cottingham made the sale to

him; that Cottingham and German were partners, or were jointly interested in the alleged patent-right; or that Cottingham had anything to do in the sale to, and the purchase of appellant. But from the evidence of German introduced by the appellant, the reverse thereof would seem to be true. The plea in respect to the $150 bond, being based upon these facts, it follows, as a necessary consequence, that a failure to establish them would determine the issue thereon for the appellee; for we hold that it was necessary for the appellant to have shown some agency, or community between Cottingham and German, before the declarations or admissions of the former could be taken or regarded as affecting the latter. Otherwise, there would be no security for the rights of individuals. After the purchase from Cottingham by German was concluded, the subject matter of the contract, as far as Cottingham was concerned, had departed from him. He stood in respect to *it*, and his vendee, as a stranger, and as if he had never known them. His feelings and sympathies for German, though never so kind, without other privity, could not authorize him to make representations, which could conclude German, or in anywise embarrass or hinder his rights in respect to the thing bought. What he may have said to appellant or his Methodist brethren, posterior to the sale to German, so far as the transaction between the appellant and German and his assignee are involved, must be regarded as wholly foreign to the subject under consideration: and as was properly remarked by the judge, who tried this cause in the court below, should have been "discarded from the minds of the jury in making up their verdict," which it seems they did. As to the issue, then, upon the first plea of the appellant, in respect to the $150 bond, we hold that the verdict of the jury must be affirmed.

As to the second plea of the appellant, applicable to the $300 bond, it will be perceived on reference to it, as we have shown from our statement of the case above, it is, in effect, like the one we have just been considering, except that it is averred therein, that German did what was charged in that to have been done by Cottingham.

What is the evidence in support of the issue on this plea? It is the bill of sale made by German to appellant, in these words: "That I have this day sold to Fountain Brown the patent-right to Jefferson and Dallas counties of Newsom's Vegetable Tonic:" the testimony of German, to the effect that this note was given as the consideration, and the evidence of the Commissioner of Patents, and of the Patent Office, that no such medicine had ever been patented under the acts of Congress.

There can be no doubt, from this proof, that the subject matter of the sale was not the knowledge of making and the right of using and vending this medicine, but that it was *the exclusive rights known to be conferred upon the inventor and his assignees by the act of Congress in respect to it, within the counties named.* It is evident from this instrument, that *this* was the consideration inducing the purchase on the part of the appellant. If it was not, why did appellant go to the witness, German, as he states, after he discovered and ascertained that the medicine was not *really patented,* and demand of him his notes, and ask that the trade which he had made, might be canceled? The bill of sale purports to convey "a patent-right." If such right is the subject of sale, strictly speaking, such sale only conveys *an incorporal right,* one that is intangible, and subsists only in essence, or action. When German sold to appellant the patent-right to "Newsom's Vegetable Tonic" for the counties of Jefferson and Dallas, he sold him the art and mystery of its manufacture; the exclusive right *to* use, vend and sell it within those counties, as incidents of the patent. If, therefore, it is manifest from the evidence, as we have already held it to be, that there was no patent really issued to the original (supposed) patentee of this medicine, it follows as a legitimate fact, that appellant bought nothing from German; for we hold that, to make a sale executed, in legal parlance, the subject matter must be in existence at the time, or the contract is utterly and absolutely void. We do not pretend to hold, that a man may not make an *executory sale of* articles not manufactured, or of things at a distance, &c., &c., but we apprehend that in re-

spect to executed sales, the thing must be in existence at the time, or the contract be void. Wherefore, in respect to the $300 bond, we hold there was no evidence before the jury which could have authorized them to find for the appellee. There was no conflict in the testimony in respect to this bond. There was no counter testimony for them to weigh. It was all on one side. Without intruding upon the principles contained in the former adjudications of this court, or doing violance to the constitutional powers of the jury, we hold that the finding for the appellee, in respect to the $300 bond, was unwarranted by the law and the evidence, and that the verdict is therefore for too much, to the amount of such bond, and the interest which had accrued thereon to the date of the judgment in the court below.

As it is possible, from the judgment which we will render in this cause, that it may go back to the Circuit Court of Jefferson county for future adjudication, and inasmuch as these and other points presented by the assignment of errors, may arise in the court below, we feel that we are called upon, also, to pass upon them.

It is assigned that the Circuit Court erred in its instructions to the jury. We think it very clear, from the principles already stated, that the court did err in giving several of the instructions asked for by the appellant, and that it was possible for the jury to have been misled by them. But as they were asked for by him, and as the injury likely to result from them, must have been in his favor, he cannot be heard to complain ; he is estopped from setting up the error in his behalf, and must abide the consequences of his own wrong. And in regard to the instruction given by the court, on its own suggestion, though we do not approve of it in detail; yet, in the main, we conceive he correctly stated the law bearing upon the particular state of facts developed at the trial. And we entirely concur with him, so far as his instructions went to exclude the declarations made by Cottingham, after the purchase made from him by German, for the reasons before herein assigned; and see 1 *Greenleaf's Evidence, section* 111, 112 113, 114.

We only object to the instruction under consideration, because of its ambiguity and uncertainty, but do not conceive it possible that the jury could have been misled by it, farther than in respect to the $300 bond.

Wherefore, unless the appellee will enter a remittitur for the sum of $300, and the interest which had accrued thereon from the time of its maturity to the date of the judgment below, the judgment of the Jefferson Circuit Court will be set aside, and a new trial granted.