LONGER *v.* BEAKLEY.

Opinion delivered January 13, 1913.

1. INSURANCE—CHANGE OF BENEFICIARY—FORGERY OF SIGNATURE—EVIDENCE.—Where F. held life insurance and it was contended that he had signed a request for a change of beneficiary from his children to the plaintiff, which request was signed by F. and attested by B., president of the lodge, and P., secretary of the same, in an action by plaintiff for the proceeds of the policy, evidence of witnesses that F. stated after the date of the alleged request for change of beneficiary, that his insurance was payable to his children, is admissible to prove that the signature of F. to the request was a forgery. (Page 226.)

2. SAME—SAME—SAME.—In an action by plaintiff for the proceeds of a life insurance policy, where it was contended that deceased had executed a request, changing the beneficiary under the policy, where B.'s name appeared on the request as president of the lodge, and deceased's signature was attested by P., secretary of the lodge, B.'s testimony that she had not signed the request, nor given any one authority to sign her name thereto, is admissible; and on cross examination P. may be asked if he signed deceased's name to the request. Evidence that plaintiff told witness that she was not engaged to deceased is competent to contradict a statement of P. that she told him she was engaged to deceased. Evidence is admissible of a display of affection by deceased for his children just prior to his death, and of a statement by deceased that plaintiff "has stolen my money and papers." (Page 226.)

Appeal from Lawrence Circuit Court, Eastern District; *R. E. Jeffery,* Judge; affirmed.

*W. A. Cunningham,* for appellant.

1.  The court erred in permitting the introduction of irrelevant testimony. The testimony as to the signing of Mrs. Baulch's name and as to the engagement were attempts to impeach the witnesses by contradicting them upon immaterial matters, which is not permissible. 34 Ark. 485; 58 Ark. 125; 59 Ark. 435; 72 Ark. 409.

2.  The testimony of Stone, Davies and others to the effect that Frankring had stated to them that he had $1,000 life insurance payable to Annie and Bertie, and that of Davies and others that Frankring stated to them that Moll, meaning the appellant, had stolen his papers and money, was purely hearsay, and inadmissible. They are not declarations against interest, the only element that could render them admissible, but are in a class with statements of a vendor as to title after conveyance, or with admissions of an assignor of an account stated after the assignment. 11 Ark. 270; 14 Ark. 304; 20 Ark. 216; 40 Ark. 237; 43 Ark. 320; 45 Ark. 472; 48 Ark. 169; 87 Ark. 497; 96 Ark. 171; 10 Ark. 428.

*J. N. Beakley* and *McCaleb & Reeder,* for appellee.

Since it has been decided that Pinchback's testimony to the effect that Frankring had authorized him to change the name of the beneficiary in the insurance certificate could not be arbitrarily disregarded, 29 Ark. Law Rep. 251, the question involved in this appeal, and the only question is whether or not this testimony was true.

To sustain his denial that it was authorized, and to prove that it was a forgery, plaintiff had the right to introduce any testimony tending to show the reasonableness or unreasonableness of Pinchback's story and tending to impeach or contradict his testimony, to show the intention of deceased with reference to the disposition of his insurance, his mental condition and attitude toward the respective claimants.

The testimony of Stone, Davies and others was competent, independent of any other reason, to show his

love and affection, and intention to provide for his daughters, and that of Davies and others was competent to show his feelings toward appellant. 16 Cyc. 1001; 2 Wigmore on Ev. 1791; 12 Ark. 804; 60 Md. 381; 10 Abb. Pr. N. S. 300; 51 Tex. 65; 3 Wall Jr., 88 Fed. Cas. No. 14, 257; 3 Ohio C. D. 79; 2 *Id.* 477; 1 Moody & R. 525; 128 S. W. (Ky.) 1057; 14 Enc. of Ev., 255, 256; 59 Ark. 613.

SMITH, J. This is the third appeal of this case to this court. The suit was originally brought by the beneficiaries under a policy of insurance upon the life of one Antone Frankring against the insurance company. The policy was originally payable to the children of the said Frankring; but there was an apparent change in the beneficiary and at the death of the said Frankring, the policy was payable to Mary Longer, the appellant herein.

In the second appeal, the case was reversed and remanded to be tried upon the issue as to whether Frankring authorized the change in the benefit certificate. *Longer* v. *Carter,* 143 S. W. 575, 102 Ark. 72.

This certificate was originally issued by the Loyal Fraternal Home, an insurance corporation, having lodges at various points in the State, and one at Walnut Ridge, the home of the said Frankring, but later the National Annuity Association, a fraternal beneficiary association of Kansas City, assumed the outstanding benefit certificates issued by the Loyal Fraternal Home Company. The request for change of beneficiary was endorsed upon the certificate and was signed in the name of Frankring and attested by Mrs. Lola P. Baulch, the lodge president, and F. S. Pinchback, the lodge secretary, and the transfer had been approved by the president of the annuity association.

The policy contained this provision, ''A benefit certificate may be made payable to one or more persons bearing the relationship to the member of wife, husband, child, sister, brother, grandparent, grandchild, stepparent, affianced wife, half-sister, father, mother, adopted child, adopted parent, half-brother, aunt, uncle, niece, or nephew. No certificate can be transferred to any other person than above. No benefits shall be paid to a person

designated as a dependent, unless dependency shall be shown to exist at the time of the death of the member.''

At the trial, from which this appeal is prosecuted, it was claimed by the appellant that the said Frankring had boarded with her for some time; that he had become estranged from his family, and that they were engaged to be married, and that, in view of this engagement, the benefit certificate was changed and made payable to her. The contention of appellees, who were the children of the said Frankring, was that the assignment was a forgery and that there was no marriage engagement between their father and the said Mary Longer. Appellant complains of a number of errors alleged to have been committed at the trial, which are substantially as follows:

First, The action of the court in permitting Mrs. Baulch, the lodge president, to testify that she had not signed her name as a witness to the request for change of beneficiary and had not authorized any one else to sign her name, and did not know that this had been done until after Frankring's death.

Second, Because appellee, who was the plaintiff below, was allowed to ask a witness, named Pinchback, if he signed the name of Mrs. Baulch to the request for change of beneficiary.

Third, Because plaintiff was permitted to prove that just before Frankring died, he sent for his children and plaintiff was allowed to show affection there demonstrated.

Fourth, Because witnesses were permitted to state that after the date of the alleged transfer of the certificate, Frankring had stated to them that his insurance was payable to his children.

Fifth, Because witnesses were permitted to state that Frankring had said to them, after the date of the alleged change of beneficiary, when speaking of appellant, ''Old Mollie, the d—d old b—— has stolen my money and papers.''

Sixth, In permitting witness Beakley to state that

appellant told him she was never engaged to Frankring and would not have married him.

Seventh, Because the court had permitted counsel for appellee to state in his argument to the jury that ''Pinchback *had* admitted that he forged the name of Mrs. Baulch to the certificate and that, if he would do that, he would forge the name of Antone Frankring,'' or words to that effect.

The objections above stated were preserved in various exceptions to the action of the court in admitting evidence and in charging the jury. The evidence showed that the policy represented almost the entire estate of the said Frankring, who was unable to sign his name and who had not signed his name to the request for the change of beneficiary. The evidence of Mrs. Baulch that she had not signed her name, nor authorized it to be signed was, of course, admissible under any theory, and it was proper to ask the witness, Pinchback, who testified on behalf of the appellant, on his cross examination, if he had signed Mrs. Baulch's name. This was necessarily proper, and especially so when that witness had testified on his direct examination that Frankring had told witness that he and Mollie (appellant) were going to marry, and that witness wrote the names signed to request for change of beneficiary at the direction of Frankring and had written Mrs. Baulch's name because she was the president of the lodge, and that he wrote her name because she did not have to sign the paper.

The evidence of Beakley that appellant told him she was not engaged to Frankring was competent for the purpose of contradicting the statement of Pinchback that Frankring had told him of the existence of this engagement. The proof was relevant because, under the by-laws of this society, appellant could not have been named as beneficiary, in the absence of this engagement.

The third and fifth grounds, above mentioned, showed the state of feeling of Frankring to the respective litigants; and the fourth ground relates to his statements, which tended to impeach the authenticity of the change of beneficiary.

There is no question here about Frankring's capacity to make the request for change of beneficiary, which he is alleged to have made, and if the execution of this request was conceded, either the third, fourth, or fifth grounds would call for the reversal of the case; but it is not admitted that he executed this request. It is not even claimed that he signed the request by his own hand, it is said merely that he authorized Pinchback to make this request for him. Necessarily, therefore, the argument of appellee's counsel that the signatures were a forgery, was a proper one, for that is the issue in the case. There was considerable evidence on the question of the general reputation for truth and veracity of both Pinchback and appellant, and a sufficiency to have supported a finding either way on that question.

Counsel have not cited us to any case, nor have we found one, which discusses and decides the exact point here involved. By analogy, however, there are many cases which are in point and which grew out of contests over the execution of wills and discuss the principles of the law of evidence here involved. For all practical purposes, the execution of this request for change of beneficiary was Frankring's will, because it disposed of practically all he owned. Did he make such request and has the court committed any error in the admission of evidence bearing upon that question?

In *Shailer* v. *Bumstead and others,* 99 Mass. 112, a will was contested upon the ground, among others, that the testatrix was of unsound mind and had been unduly influenced by two of the beneficiaries and was ignorant of the contents of the will at the time of the execution. The contestants relied upon evidence of declarations of the testatrix, made at the time of executing the will, and also before and after that time to the effect that she intended a disposition of her property other than that made by the will, and there was evidence tending to show undue influence of the principal beneficiaries under the will.

As further evidence that the will was made contrary to the real intentions of the testatrix, or that she was ignorant of its contents, and that its execution was pro-

cured by fraud and undue influence, the contestants offered to prove declarations of the testatrix and of the beneficiaries subsequent to the date of the will. The evidence of such subsequent declarations and conduct was excluded, so far as they were offered to sustain the allegations of fraud and undue influence and ignorance of the contents of the will. In discussing this action of the court below it was there said: "That the instrument which contains the testamentary disposition of a competent person, executed freely and with all requisite legal formalities, must stand as the only evidence of such disposal is generally conceded. Such a will is not to be controlled in its plain meaning by evidence of verbal statements inconsistent with it; nor impaired in its validity and effect by afterthoughts, or changes in the wishes or purposes of the maker, however distinctly asserted. It is to be revoked only by some formal written instrument, some intentional act of destruction or cancellation, or such change or circumstances as amounts in law to a revocation.

"An invasion of this rule opens the way to fraud and forgery; promotes controversy; destroys to a greater or less degree that security which should be afforded to the exercise of the power to control the succession to one's property after death. But the rule assumes that the will sought to be affected has once had a valid existence. It is always liable to be impeached by any competent evidence that it was never executed with the required formality, was not the act of one possessed of testamentary capacity, or was obtained by such fraud and undue influence as to subvert the real intentions and will of the maker. The declarations of the testator accompanying the act must always be resorted to as the most satisfactory evidence to sustain or defend the will, whenever this issue is presented. So it is uniformly held that the previous declarations of the testator, offered to prove the mental facts involved, are competent. Intentions, purpose, mental peculiarity, and condition, are mainly ascertainable through the medium afforded by the power of language. Statement and declarations, when the state

of the mind is the fact to be shown, are therefore, received as mental acts or conduct. The truth or falsitiy of the statement is of no consequence. As a narration, it is not received as evidence of the fact stated. It is only to be used as showing what manner of man he is who makes it." And it was further said, "Upon the question of capacity to make a will, evidence of this description is constantly received; and when the issue is one of fraud and undue influence, it is equally material." And it was there further said:

"The precise statements of the testatrix are not reported, nor does it appear at what precise time they were made, but they were offered to show either ignorance of the contents of the will, or that they were contrary to her real intentions, and that the will was improperly obtained by the fraud and undue influence of the beneficiaries.

"As we have already seen, this evidence was not competent as a declaration or narrative to show the fact of fraud or undue influence at a previous period. But it was admissible not only to show retention or loss of memory, tenacity or vacillation of purpose, existing at the date of the will, but also in proof of long cherished purposes, settled convictions, deeply rooted feelings, opinions, affections, or prejudices or other intrinsic or enduring peculiarities of mind, inconsistent with the dispositions made in the instrument to be set up as the formal and deliberate expressions of the testatrix's will; as well as to rebut any inference arising from the non-revocation of the instrument."

The case of *Mobley* v. *Lyon,* 67 S. E. 668, originated in a proceeding to probate a paper as the will of one Mary L. Spencer and it was there alleged that: (1) "The instrument offered was not the will of the said Mary L. Spencer, and, if it was signed by her, it was not drawn by her, was not read over to her, and she was ignorant of its contents at the time of signing same and remained ignorant of it during the remainder of her life and died ignorant of its contents; (2) It is not the will of said Mary L. Spencer, because she never signed it, and knew

nothing of it, but the same is a forgery." The court said: "One of the witnesses whose name appeared to be signed to the will was J. A. Stover. The evidence showed he was dead and the propounders introduced testimony to prove his handwriting. The caveator introduced counter testimony for the purpose of proving that the purported signature of Stover was not genuine. The caveator offered evidence of the son of Stover that he had had several conversations with his father occurring after the death of the testatrix, in which his father said that it seemed very strange that Mrs. Spencer did not make a will, and asked the son if he had heard Mrs. Spencer say anything about a will. This evidence was admitted over objection upon the part of the propounders. The objections may be reduced to two substantial points (1) was the evidence inadmissible as hearsay; (2) was it inadmissible on the ground that the attesting witness being dead, he could not be asked touching conflicting statements, and therefore, could not be impeached by their production." The court speaking through Atkinson, Justice, said: "We do not think either reason sufficient ground for excluding the evidence," and, after citing a large number of cases, both English and American, and discussing the conflicting views expressed by them, said in regard to the admissibility of the evidence above offered: "The proof of attestation, therefore, carries with it something more than the mere fact that the witness signed the paper. If the witnesses are placed on the stand, they can be cross examined, and can be asked if they have not made statements conflicting with other testimony as given. If one or more of these is dead, and evidence is introduced to prove his signature, the purpose and effect is not solely to prove that such witness or witnesses signed the paper, but from that fact to derive inferences, largely dependent upon the presumption that, when they purported to sign properly, they did so. When this additional effect is to be used, it can not be contradicted; it not being possible to cross examine such attesting witness, or to lay the foundation for impeachment. If proof of the handwriting of the attesting wit-

ness is to carry with it the force of an assertion by him that the instrument was executed because he witnessed it, this implied assertion should be impeachable by showing that he had made statements conflicting with it. The rule as to making a preliminary examination and calling the attention of the witness to conflicting statements before introducing them, can not be applied in such a case. * * * We recognize the fact that there may be some danger arising from the admission of such impeaching testimony, but there is also danger in admitting dying declarations, statements claimed to be part of the *res gestae*, opinions of witnesses, and proof of the signature of an attesting witness itself, as having probative value in lieu of the introduction of the witness. But the danger of abuse arising from the admissibility of the evidence can not destroy such admissibility, or outweigh the counter danger arising from admitting mere proof of the handwriting of a witness to have evidential value of the execution of a will without the introduction of the witness, and at the same time absolutely shutting off any practical mode of impeaching or destroying such evidential value, thus in effect, relaxing the rule requiring the production of the witness in favor of one person without relaxing the rule that the witness when produced must be asked about the conflicting statements before proving them.''

Presiding Justice Evans and Justice Holden dissented from the decision of the court on the admissibility of this evidence and expressed the view that on the issue of forgery of a will, the declarations of an attesting witness, made subsequent to the attestation are inadmissible to impeach the *factum* of attestation.

In the case of *Gibson* v. *Gibson*, 24 Mo. 227, where it was sought to invalidate a will on the ground that the alleged testator was under undue influence, and was at the time of signing the will of unsound mind by reason of intoxication, and proof was offered of declarations made by him to the effect that he had never signed the will and that if he had signed it he was drunk and had been made to do it, the court said: ''The just result of

the whole matter, we think, is, that these declarations, so far as they are relied upon to furnish evidence of the facts they contain, are mere hearsay, and that there is no ground, either of authority or reason, to exempt them from the rule of law excluding all such testimony. We repeat, however, what we have before remarked, that as mere verbal facts, external manifestations of what is passing within, they are always evidence of the testator's intellect and affections, for the time being, provided they are of such a character, either by themselves or in conjunction with other evidence, and are so connected with the making of the will in point of time, as to furnish any reasonable ground of judgment in reference to the testator's mental condition at that time. Accordingly, in *Norris* v. *Shepherd* (20 Pa. 475), where a person absent from home had by will disposed of all his property to a mere stranger, after other evidence of insanity at the time, and that the testator lived on amicable terms with his sisters, who were his nearest relatives, had been given his declarations, made to a friend just before leaving him, in reference to insuring his life, in which he said: "I will not, as the little I have will go to my sisters," were allowed as evidence of the state of his affections towards them, in order to strengthen the proof of insanity then before the jury; the court remarked that, under the circumstances of that case, the kind relations of the testator with his kindred was proper evidence, and that these relations could only be shown by the testator's acts, and declarations towards them. So again in *Waterman* v. *Whitney* (1 Kernan, Rep. 157) the question was as to the mental capacity of the testator, and after evidence showing that his mind and memory were impaired at and previous to the time of making his will, and that he had not sufficient capacity to make a will, proof was offered and rejected in the original court that the testator had afterwards stated to the witness, and repeated to others, at different times up to his death, how he had disposed of his property in his will, which was in a manner entirely different from the actual disposition of it by the will in question. But upon an appeal the evidence

was held admissible, taken in connection with the other evidence in the cause, as a mere fact, showing the want of mental capacity, without any regard to the credit due to it as an assertion of fact; and whatever may be thought of the correctness of the particular decision, the court expressly recognized, and indeed professed to act, upon the distinction to which we have referred between receiving a testator's declarations as evidence of the asserted facts, and allowing them in evidence as mere facts, indicating of themselves the mental condition of the testator at the time they are made. It may frequently be a nice question to determine whether the declarations furnish any reasonable grounds for a just judgment in reference to the condition of the testator's mind at the time; and even supposing they do, the question still remains whether his mental condition at that time—whether before or after the date of the will—reflects any light upon it when the will was made, which is the point of time to which the ultimate investigation must be confined; but there can be no difficulty, we think, as to the general rule of law applicable to all such cases."

The case of *Travellers Ins. Co.* v. *Mosley,* 8 Wall. 397, was a suit on an accident policy and the question was whether assured died from an accidental fall downstairs, or from natural causes, and proof was admitted showing complaints and declarations of the assured as to bodily injury and pains and the court said, "Whenever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent, explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony when relevant to the issue. Their truth or falsity is an inquiry for the jury." 8 Wallace, 408.

In the case of *Hester* v. *Hester,* 16 Atl. 345, it was said: "The declarations of the testator, made within a reasonable time before and after the execution of the will, have always been received in evidence upon a question of testamentary capacity, to show the state and condition of the testator's mind; and, if reasonably connected in point of time with the testamentary act, we can not see any reason why they would not be admissible to establish the same fact in an issue raised upon the exercise of fraud and undue influence in the procurement of it. Such declarations can not have any force, however, in establishing the substantive fact of undue influence."

Shouler, in his work on Wills, at page 119, says: "Many decisions, not altogether harmonious, relate to the testator's declarations in issues of the present kind (issues relating to fraud, force, or undue influence). The general rule is that a testator's previous declarations are admissible, within a liberal range, for the purpose of throwing light upon his mental condition, his exposure to constraint or fraud and the surrounding circumstances of the testamentary act."

In *Bush* v. *Bush,* 87 Mo. 485, where proof was offered touching declarations of a testator prior to the making of his will which indicated an intention to make a disposition of property contrary to the one made in the will, it was said: "Such evidence was inadmissible as a narrative of facts, but admissible when the condition of the testator's mind is the point of contention, or it becomes material to show the state of his affections, and they are then received as external manifestations of his mental condition and not as evidence of the truth of the facts he states."

Professor Wigmore in his work on Evidence, vol. 2, § 1768, says: "The prohibition of the hearsay rule then does not apply to all words or utterances merely as such. The hearsay rule excludes extra-judicial utterances only when offered for a special purpose; namely, as assertions to evidence the truth of the matter stated."

Accordingly, if it were conceded that Frankring had in fact signed his name to the request for change of bene-

ficiary or that he had authorized Pinchback to do so for him, then without question, the objections of appellant would have been well taken and a reversal would be ordered on that account. But these declarations are admissible to show that he had, in fact, made no request for change of beneficiary. If such declarations are admissible to show the absence of testamentary capacity, why, then, should they not be received to show that the will was forged, or as in this case, that the request was forged. The purpose and effect in both cases of such evidence is to show that there was no valid signature. The issue, in fact, here involved is that of the forgery of Frankring's name and the jury must necessarily have found that he knew nothing about this request for change of beneficiary. It was not offered for the purpose of showing that Frankring desired to make a disposition of his certificate other than the one which was accomplished by the request for change of beneficiary, but was offered for the purpose of showing that he had not made the request at all. In no other way was it possible to contradict Pinchback and without this proof it would have been arbitrary for a jury to have disregarded his uncontradicted statements, while the evidence inferentially does contradict him and prevents the certainty of a great injustice being done Frankring's infant children. And we conclude that the court did not err in its action in allowing the jury to consider this evidence and to pass upon its weight and the judgment is accordingly affirmed.

McCulloch, C. J., and Kirby, J., dissent.

### ON REHEARING.

Smith, J. In the motion for a rehearing, it is again insisted that error was committed in the admission of the testimony of Beakley that Mrs. Longer told him that she was not engaged to Frankring, and that this evidence could not have been admissible under the state of the record. It is true that the insurance company had passed out of this litigation, in the second appeal of this case, and that it was there said, "that the society itself may waive the ineligibility of the designated beneficiary and

the original beneficiary, having no vested interest in the benefit, is not in position to complain." *Longer* v. *Carter,* 102 Ark., 72.

The court below did not reopen the question of the eligibility of Mrs. Longer to have the certificate assigned to her, but confined the issue to the one which the opinion on the last appeal directed to be submitted to the jury, that is, "as to whether Frankring authorized or ratified the change of his benefit certificate." It was the theory of appellee that the signature of Frankring was a forgery and was unauthorized, and in support of that issue, offered the evidence which is discussed in the opinion. Appellant, upon her part, to show that the signature was authorized, and to make that statement appear probable, testified she was engaged to Frankring, and Pinchback testified to the same effect and for the same purpose. Appellant recognized the importance of having it appear that she and Frankring were affianced. Under this state of the record, Beakley's evidence was competent to contradict Pinchback on that question and it also tended to show the signature was a forgery, for Pinchback was the man who signed Frankring's name and had testified that Frankring assigned this fact as his reason for the change of beneficiary, when he directed the change to be made.

McCULLOCH, C. J. (dissenting). The sole question at issue in the last trial of this case was whether or not Frankring authorized the change of his designation of beneficiaries from his children to the appellant, Mrs. Longer. Appellant adduced affirmative, direct evidence that the change was authorized. Such was the testimony of Pinchback, who stated that he signed Frankring's name to the instrument of writing directing the change, and did so in the latter's presence and upon express authority from him. No witness directly contradicted that statement. I maintain that the testimony as to Frankring's subsequent statements was inadmissible for the purpose of showing that he did not authorize the change of beneficiary. It is hearsay and clearly does not fall within any of the exceptions to the inadmissibility of that class of testimony. Statements against one's own in-

terests are generally admissible, but self-serving declara-
tions are not.  The statements proved in this case do
not come within either of those classes, for they were
against the interests of one claimant and in favor of the
others.  But the principle which forbids the introduction
of self-serving declarations as testimony is equally po-
tent against the admissibility of statements for or
against the interests of either claimant in controversies
of this kind.  The majority of the judges liken this case
to a controversy concerning the execution of a will and
cite authorities to the effect that in such controversies
testimony as to statements of the testator is admissible
to establish his state of mind for the purpose of showing
whether he was of sufficient mental capacity to execute
a will.  None of the cases go to the extent of holding that
such testimony is admissible to show whether or not the
testator signed a will.  In fact, the cases cited hold just
to the contrary and decide that such testimony is admis-
sible for the sole purpose of establishing the state of
mind of the testator, but is not competent as a statement
of the fact whether or not a will had been executed.

In *Gibson* v. *Gibson,* 24 Mo. 227, the court said:

"These declarations, so far as they are relied upon
to furnish evidence of the facts they contain, are mere
hearsay, and there is no ground, either of authority or
reason, to exempt them from the rule of law excluding
all such testimony."

In *Bush* v. *Bush,* 87 Mo. 485, the court said: "Such
evidence was inadmissible as a narrative of facts, but
admissible when the condition of the testator's mind is
the point of contention."

In the present case the question of Frankring's
mental capacity was not in issue.  As before stated, the
sole question was whether or not Pinchback signed his
name to the direction for change of beneficiaries in his
presence and at his request.  His subsequent statement
showing the state of his mind toward the two sets of
claimants had no legitimate bearing as evidence of the
question at issue.

Mr. Wigmore, in the statement of his very liberal

views on the subject of exceptions to the rule against hearsay evidence, says: "The hearsay rule excludes extra-judicial utterances only when offered for a special purpose, namely, as assertions to evidence the truth of the matter stated." 2 Wigmore on Ev., § 1763.

The rule is well established that declarations of an assignor or of a vendor in the absence of the assignee or vendee can not be admitted to impeach the validity of the assignment or sale. *Gullett* v. *Lamberton,* 6 Ark. 109; *Humphries* v. *McCraw,* 9 Ark. 91; *State* v. *Jennings,* 10 Ark. 428; *Rector* v. *Danley,* 14 Ark. 304; *Brown* v. *Wright,* 17 Ark. 9; *Finn* v. *Hempstead,* 24 Ark. 111; *Crow* v. *Watkins,* 48 Ark. 169.

That principle should control in the present case, for it involves the idea that subsequent declarations of one party to an alleged transaction can not be received in evidence as a narrative of the fact.

The case of *Leslie* v. *McMurty,* 60 Ark. 301, is, in my judgment, absolutely decisive of the question now before us. There the court, speaking through Mr. Justice RIDDICK, held that "declarations of a devisor, made after the will was executed, to the effect that he had made no will, are inadmissible to prove that the will was forged." The court quoted with approval the leading case of *Boylan* v. *Meeker,* 28 N. J. L. 282, where, in speaking of the rule admitting, as evidence, declarations against interest, it was said: "No such motive operates to secure truth in the declarations of a devisor. He may, to secure his own peace and comfort during life, to relieve himself of unpleasant importunities of expectant heirs, conceal the nature of his testamentary dispositions, and make statements calculated and intended to deceive those with whom he is conversing."

My conclusion is that prejudicial error was committed in allowing the statements of Frankring to go to the jury, and that on account of those errors the judgment should be reversed and the cause remanded for a new trial.

Mr. Justice KIRBY concurs in these views.